**LAW OFFICES OF JEFFREY S. GLASSMAN, Plaintiff,**

v.

**Raymond PALMISCIANO and Robert Lafazia, Defendants,**

**Amica Mutual Insurance, Inc., Reach and Apply Defendant.**

**Civil Action No. 07–10306–DPW.**

United States District Court, D. Massachusetts.

Dec. 29, 2009.

Edward C. Cooley, Giarusso, Norton, Cooley & McGlone, Quincy, MA, Jeffrey S. Glassman, Law Offices of Joel H. Schwartz, P.C., Boston, MA, for Plaintiff.

William P. Devereaux, Matthew C. Reeber, Pannone Lopes & Devereaux LLC, Fred T. Polacek, Providence, RI, for Defendants.

### MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

This action is brought by the Law Offices of Jeffrey S. Glassman, LLC (the "Plaintiff" or "Glassman LLC") against Robert Palmisciano, a former client, and Raymond Lafazia, a successor attorney, (collectively, the "Defendants"),[1] alleging that Palmisciano failed to honor his contingency fee agreement with Plaintiff (the "Contingency Agreement") and that Lafazia interfered with that agreement. Plaintiff and Defendant Lafazia have moved for summary judgment in their favor on Plaintiff's claims. For the reasons discussed below, I will deny Plaintiff's motion for summary judgment and will grant in part and deny in part Defendant Lafazia's motion for summary judgment.

## I. BACKGROUND

### A. The Parties

Plaintiff Glassman LLC is a law firm located in Massachusetts. Glassman LLC is the successor in interest of the Law Offices of Jeffrey S. Glassman LLP ("Glassman LLP") which assigned its assets and liabilities, including the contractual obligations and rights it had under the Contingency Agreement, to Plaintiff in June 2006.

Defendant Robert Palmisciano is an individual currently residing in Rhode Island. While this fact is disputed among the parties, it appears that Palmisciano also resided in Rhode Island but had a post office box in Massachusetts at the time he entered into the Contingency Agreement with Plaintiff.

Defendant Raymond Lafazia is a Rhode Island attorney and a resident of Rhode Island.

### B. The Facts

1. *The Creation of the Contingency Agreement*

On May 14, 2003, Palmisciano went to Glassman LLP's office in Boston to obtain legal representation with respect to a North Kingston, Rhode Island accident involving a 2002 collision of a car he operated with a car operated by Caroline Peck during which Palmisciano suffered personal injuries.[2] Palmisciano signed that day the Contingency Agreement pursuant to which he retained Glassman LLP to "handle, compromise, adjust and do any and all necessary things" regarding his personal injury claim. Under the Contingency Agreement, Palmisciano agreed that:

---

1. Plaintiff also claimed that it was entitled to reach and apply (Count III) Defendant Raymond Palmisciano's right to receive monies from Amica Insurance Company ("Amica") and enjoin (Count IV) Amica from paying the settlement funds to Palmisciano. Because the full amount has already been paid by Amica, I consider these claims to be moot and will dismiss them.

2. Prior to contacting Plaintiff, Palmisciano contacted Michael McLaughlin, a Boston attorney to whom he owed a legal fee on a separate matter and asked McLaughlin to represent him in his personal injury claim. Because McLaughlin did not usually handle personal injury cases, he referred Palmisciano to Glassman LLP and thereby earned a referral fee.

if [Glassman LLP] is discharged with a pending offer, it shall be considered that [Glassman LLP] has substantially performed his duties pursuant to the contingency. Moreover, [Glassman LLP] under the Contingency shall be compensated for One–Third (33%) of the gross amount of the settlement offer at the time of discharge, or 40% at the time of the discharge after initiation of a law suit.

The Contingency Agreement further provided that Palmisciano "is in any event liable to [Glassman LLP] for reasonable expenses and disbursements."

### 2. The Role of Attorneys Glassman, Cohen and McKinney in the Palmisciano v. Peck Matter

From 2003 to 2005, Glassman LLP prosecuted Palmisciano's claim by, among other things, compiling medical documentation and other documents. In an attempt to negotiate a prelitigation resolution of Palmisciano's claim, Attorney Jeffrey Glassman sent a formal demand for settlement to Arnica on April 26, 2005.

A mediation was held in Providence, Rhode Island in October 2005. When the negotiations broke off, Arnica had offered $175,000.00. Attorney Glassman at that point informed Palmisciano that Attorney Neil Cohen, then a partner at Glassman LLP, would be handling the case as his trial attorney.

On November 10, 2005, Glassman LLP filed a law suit on behalf of Palmisciano in the Washington County Superior Court of Rhode Island, Palmisciano v. Peck, Civil Action No. WC–2005–0683, (the "Peck case"). Prior to filing suit, Glassman LLP had engaged a Rhode Island attorney, Patrick McKinney, to act as local counsel. Cohen was subsequently admitted pro hac vice on motion filed by McKinney. During the discovery process, Attorney Glassman continued to conduct negotiations with Arnica's Senior Claims Supervisor, Paul Schino, in an effort to reach a settlement.

In March 2006, Cohen left Glassman LLP over a business dispute. Cohen did not, however, contact Palmisciano to inform him that he left Glassman LLP. Palmisciano only learned about Cohen's departure in May 2006 when he received a communication from Glassman LLP asking him to approve two pro hac vice admission forms designed to allow other Massachusetts attorneys to appear before the Washington County Superior Court of Rhode Island. Palmisciano refused to sign the forms without further discussion.

On June 21, 2006, Arnica offered $425,000.00 and Attorney Glassman purported to accept Arnica's offer on behalf of Palmisciano. On the same day, Attorney Glassman sent Palmisciano a settlement release suggesting that Palmisciano should reconsider his decision not to sign the paperwork pending a forthcoming surgery. Palmisciano refused to sign the settlement release and sent Attorney Glassman an email on that same day stating that Glassman did not have any authority to accept any offer without his agreement and that Glassman was to cease all activity in this matter until he further heard from Palmisciano.

Shortly after instructing Glassman to take no further action in the Peck matter, Palmisciano had a conversation with McLaughlin, who had referred the matter to Glassman, see Note 2 supra, in which Palmisciano told McLaughlin, "Attorney Lafazia has told me that I can get this 425 without paying any attorney's fees at all.... Attorney Lafazia has come up with a way so that I won't have to pay him any money, and why should I have to pay that Jew."

At the beginning of September of 2006, Palmisciano contacted Cohen who agreed

to meet him in Attleboro, Massachusetts. Palmisciano and Lafazia met with Cohen and discussed Cohen's entering a stipulation of withdrawal of his *pro hac vice* appearance in the matter. Meanwhile, based upon Glassman's purported agreement to settle the *Peck* case, Arnica filed an application to enforce settlement in October 2006. Shortly thereafter, Glassman filed a petition to apportion settlement proceeds.

### 3. The Dispute Concerning the McKinney and Cohen "Discharge"

On October 23, 2006, a hearing was held regarding the enforcement of the settlement. During this hearing, Palmisciano declared that he no longer wished to have McKinney and Cohen represent him in the *Peck* matter. Lafazia subsequently entered an appearance on behalf of Palmisciano and confirmed to the Court that he would continue to prosecute the case on behalf of Palmisciano.

During the hearing, McKinney moved for permission to withdraw in accordance with Rule 1.17 of the Rhode Island Supreme Court Rules of Professional Conduct. The Court allowed the motion and further requested McKinney to submit orders reflecting his withdrawal as well as Cohen's withdrawal. McKinney drafted an order on the same day in which he declared that he was "allowed to withdraw as counsel of record for the Plaintiff effective October 23, 2006" and that Cohen's "admission pro hac vice [was] vacated," because they had both been "discharged by the Plaintiff." In addition, McKinney directed the order to allow Lafazia to enter a general appearance on behalf of Palmisciano.

During a hearing held on November 2, 2006, and in the absence of McKinney, Lafazia objected to the use of the word "discharge" in the draft order. Specifical-

ly, Lafazia declared that "[he] just didn't want it to appear that Mr. McKinney was discharged, because that ha[d] ramifications." The Court declared that it had not entered the proposed order because Lafazia had indicated to the Court in chambers that he objected to the form of this order and decided to hand the proposed order back to Lafazia.

During the November 2 hearing, the Court acknowledged that "there existed a dispute that was ongoing" regarding the Contingency Agreement. The Court further explained that:

[i]t seem[ed] abundantly clear … that Mr. Palmisciano, on the eve of what appeared to be some serious surgery, did not want to settle his claim until all of the pieces were resolved, and communicated that preference to counsel. Mr. Glassman's suggestion that Mr. Palmisciano had authorized the settlement with Arnica without having resolved the remaining details appear[ed] to this Court to be inconsistent with the surrounding facts and circumstances … I find therefore that Mr. Glassman's authority to settle with Arnica was conditioned upon completion of ongoing discussions concerning the extent of fees and liens which had not yet been completed as of June 21st.

Finally, during a hearing held on December 1, 2006, Lafazia conceded that he sought to strike the word "discharged" from the order because "the real issues here are the controversies between Mr. Palmisciano and his former counsel." Specifically, Lafazia explained that he did not "want this determination of whether it's proper discharge, improper discharge, withdrawal, abandonment." McKinney responded that there was "absolutely no question but that counsel was discharged within the meaning of that term." The Court acknowledged that "[i]t may very

well be that the only logical conclusion is as Mr. McKinney state[d]." Nevertheless, the Court determined that it did not want to make a finding of fact on the issue of "discharge" because "[t]his [wa]sn't the proper forum to adjudicate the nature and extent of what occurred between Mr. Palmisciano and his prior counsel." Accordingly the Court revised the order to strike the word "discharged."

During deposition testimony in this case on June 4, 2008, Lafazia bluntly described the strategy that he and Palmisciano had embarked upon: "We're trying to screw [Glassman] out of an unreasonable fee."

### 4. The Settlement of Palmisciano v. Peck

Sometime in 2008, Arnica offered to settle the case for $450,000.00–a $25,000.00 increase over the previous settlement offer. Palmisciano retained new counsel, David Destefano, who settled the case for that amount.

On August 1, 2008, the Rhode Island Superior Court held a hearing regarding the settlement during which the appropriate manner for addressing the attorney's fees claim by Glassman LLC in this action was discussed. Following the hearing, the Court issued an order pursuant to which a partial fee of $106,250.00 had to be paid by Palmisciano to Glassman LLC and the amount of $63,750.00 had to be paid into the Registry of the Court pending a resolution of any remaining fees due in the present action.

### 5. The Lafazia v. Palmisciano Dispute

In January 2009, Lafazia commenced an action *Lafazia v. Palmisciano*, Civil Action No. NC–2000–0023, in the Newport County Superior Court of Rhode Island against

Palmisciano seeking to recover fees for his representation of Palmisciano in the *Peck* matter. It should be noted, however, that Lafazia had declared during the October 23, 2006 hearing that he was "not looking for a fee in this case." Palmisciano later filed a counterclaim for legal malpractice against Lafazia alleging that "[t]he advice given by Attorney Lafazia to Mr. Palinisciano [*sic*] with respect to fees that may be due or not due to Attorney Glassman was clearly erroneous, unethical and contrary to the applicable rules of professional conduct." Palmisciano contends that, as a result of Lafazia's purported misconduct, the settlement of the *Peck* case was delayed for over two years and resulted in expending significant additional and unnecessary attorney's fees in attempting to resolve the case.

### C. The Procedural History

On December 18, 2006, Plaintiff initiated the litigation now before me by filing a complaint against Palmisciano, Lafazia, and Arnica in the Massachusetts Superior Court alleging breach of contract and good and fair dealing by Palmisciano; to reach and apply as Arnica and tortious interference with a contractual relation by and violation of Chapter 93A by Lafazia. On the next day, Plaintiff filed a First Amended Complaint making certain typographical changes. The case was subsequently removed to this Court on February 20, 2007.[3]

On April, 4, 2008, Plaintiff filed a Second Amended Complaint asserting claims for breach of contract by Palmisciano (Count I), breach of implied covenant of good faith and fair dealing by Palmisciano (Count II), to reach and apply (Count III) and to enjoin Defendant's right to receive funds from Arnica (Count IV), intentional inter-

---

**3.** This case was originally assigned to Judge Lindsay and then to Judge Young during Judge Lindsay's illness. The case was transferred to my docket on April 10, 2009.

ference with contractual relations by Lafazia (Count V), violation of Chapter 93A by the Defendants (Counts VI as to Lafazia and VIII as to Lafazia and Palmisciano), quantum meruit against Palmisciano (Count VII),[4] and civil conspiracy by Palmisciano and Lafazia (Count IX).

Defendant Lafazia first filed a motion for summary judgment on April 30, 2008 and a motion to dismiss on September 10, 2008. Both motions were denied by Judge Young on November 3, 2008.

Pursuant to a scheduling order I entered, Plaintiff filed a motion for summary judgment in its favor on September 18, 2009 as to Counts I, II, V, VI, VIII, and IX of the Second Amended Complaint. Defendant Lafazia filed a motion for summary judgment in its favor on all counts alleged against him.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law" based on the record before the court. *Thompson v. Coca–Cola Co.*, 522 F.3d 168, 175 (1st Cir.2008) (citing FED. R. CIV. P. 56(c)). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero–Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir.2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Generally speaking, "[c]ross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply re-

quire us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001) (citing *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir.1996)).

Once a properly supported motion has been presented before this court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Moreover, on issues "where [the opposing] party bears the burden of proof, it 'must present definite, competent evidence' from which a reasonable jury could find in its favor." *United States v. Union Bank for Sav. & Inv. (Jordan)*, 487 F.3d 8, 17 (1st Cir.2007) (quoting *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 204 (1st Cir.1992)). Throughout this process, the court cannot make credibility determinations, weigh the evidence, or draw legitimate inferences from the facts as these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

## III. ANALYSIS

Before addressing the merit s of the parties' respective positions, it is necessary to determine which state's law governs Plaintiff's claims. The parties disagree in this respect. While plaintiff argues, and Defendant Palmisciano does not dispute, that Massachusetts law applies, Defendant Lafazia contends that Rhode Island law governs in this case.[5]

---

4. In the Second Amended Complaint, there are in fact two different claims denominated in Count VII, one for declaratory judgment of entitlement to the contract amounts and the other for quantum meruit. With the distribution of the partial settlement monies the

Plaintiff has forsworn his quantum meruit claim as pled.

5. At the outset, Plaintiff argues that Judge Young rejected Defendant Lafazia's argument that Rhode Island law applies to this case when he denied Defendant Lafazia's previous

## A. Choice of Law Analysis

The present case has been removed to this Court from the Massachusetts Superior Court based on diversity jurisdiction. In cases invoking diversity jurisdiction, a federal district court must apply the choice-of-law principles of the forum state. *See Allstate Ins. Co. v. Occidental Int'l, Inc.*, 140 F.3d 1, 3 (1st Cir.1998) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The choice of law rules of Massachusetts therefore apply to the claims brought by Plaintiff.

The first step in any choice of law analysis is to characterize the claims involved. *See Trent Partners and Assoc. v. Digital Equip.*, 120 F.Supp.2d 84, 95 (D.Mass. 1999) (citing *Pen Coal Corp. v. William H. McGee and Co., Inc.*, 903 F.Supp. 980, 983 (S.D.W.Va.1995)). Plaintiff's motion for summary judgment addresses six different claims; some of them sound in contract while others sound in tort. It is therefore necessary to examine each claim separately under Massachusetts conflict of law rules.

### 1. Contract-based Claims

In Counts I and II, Plaintiff brings claims for breach of contract and breach of implied covenant of good faith and fair dealing against Defendant Palmisciano.

The Contingency Agreement purports to contain a choice of law provision pursuant to which "[t]his Agreement & and its per-

formance are subject to Rule 3:14 of the Supreme Judicial Court of Massachusetts." While the reference to Rule 3:14 [6] appears to be a typographical error,[7] the reference to Massachusetts Supreme Judicial Court Rules indicates the parties' intention to have the Contingency Agreement governed by Massachusetts law. That intention is in fact not disputed by Plaintiff nor by Defendant Palmisciano, the two only signatories to the Contingency Agreement.

It is settled that "[Massachusetts] courts routinely enforce choice-of-law provisions unless the law chosen violates established public policy or bears no reasonable relationship to the contractual transaction between the parties." *Lambert v. Kysar*, 983 F.2d 1110, 1118 (1st Cir.1993). Here, Defendant Palmisciano came to Massachusetts to enter into the Contingency Agreement with a Massachusetts-based law firm. While Defendant's residence at the time he entered into the Contingency Agreement is disputed among the parties, the Contingency Agreement shows that Defendant had a postal office box in Massachusetts. In addition, at least from the date the parties entered into the Contingency Agreement (May 5, 2003) until the date Plaintiff filed the *Peck* litigation in Rhode Island (November 10, 2005), the Contingency Agreement was performed from offices in Massachusetts. These factors are sufficient to establish that the enforcement of the parties' choice of law provision does not violate public policy and bears a reasonable relationship

---

motion for summary judgment and that this ruling is binding. I find, however, that Judge Young never explicitly ruled on the law applicable to this case but rather merely denied Defendant Lafazia's previous motion for summary judgment.

**6.** Rule 3:14 of the Supreme Judicial Court of Massachusetts relates to the possibility for the Supreme Judicial Court of Massachusetts to "establish a committee to render advisory

opinions with respect to the interpretation of rules of court relating to the ethical and professional conduct of Clerk Magistrates."

**7.** The parties presumably intended to refer to Rule 3:07 of the Supreme Judicial Court of Massachusetts, the Massachusetts Rules of Professional Conduct, in particular Rule 1.5 concerning attorney's fees.

to the contractual transaction between the parties. Accordingly, I find that the parties' choice of law provision is enforceable and therefore Massachusetts law applies to Plaintiff's contract-based claims brought against Defendant Palmisciano. Indeed, even in the absence of the parties' typographically deficient choice of law provision, *see* Note 7 *supra*, I would find that Massachusetts substantive law governs contract-based claims.

### 2. *Tort-based Claims*

In Counts V and IX, Plaintiff brings claims for tortious interference with contractual relations against Defendant Lafazia and civil conspiracy against both Defendants. These are tort-based claims.

"Massachusetts applies a 'functional approach to choice of law.'" *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 74 (1st Cir.2006) (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668 (1985)). "[T]his functional approach 'is explicitly guided by the Restatement (Second) of Conflict of Laws (1971).'" *Id.* (quoting *Clarendon Nat'l Ins. Co. v. Arbella Mut. Ins. Co.*, 60 Mass.App.Ct. 492, 803 N.E.2d 750, 753 (2004)).

The choice of law analysis for tort cases is set forth in § 145 of the Restatement. Section 145 of the Restatement provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the *most significant relationship* to the occurrence and the parties under the principles stated in § 6." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1) (1971) (emphasis added). Contacts to be taken into account in applying the principles of § 6 to

determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971).

In the present case, relevant contacts under Section 145 are in both Massachusetts and Rhode Island. The injury complained of—frustration of a Massachusetts contract—undeniably occurred in Massachusetts. The conduct that allegedly caused the injury to Plaintiff, namely Defendant Lafazia's alleged tortious interference by Defendant Lafazia with the Contingency Agreement and Defendants' alleged civil conspiracy, by contrast appears to have occurred in Rhode Island. Nonetheless, Plaintiff also points to the meeting that Defendants arranged with Attorney Cohen in Massachusetts to obtain his withdrawal as a basis for showing that some of the alleged conduct occurred in Massachusetts. Finally, the parties are located variously in Rhode Island and Massachusetts [8] and their relationship does not seem to be centered in only one state.

Because the application of the factors set forth in § 145(2) of the Restatement does not clearly point to the application of either Massachusetts or Rhode Island law, the following additional factors may be taken into consideration for choice of law purposes:

---

8. As mentioned above, while this fact is disputed among the parties, it appears that Palmisciano lived in Rhode Island but had a post office box in Massachusetts when he entered into the contingency fee agreement with Plaintiff (the "Contingency Agreement").

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971).

■ In the present case, I find that recourse to these factors supports the application of Massachusetts law. In reaching this conclusion, I consider the relevant policy interests of the states involved and the states' interest in the determination of the claims at issue. In general, each state has an interest in protecting its citizens from injury caused by the interference with contractual relations or a civil conspiracy to do so.[9] Given the fact that Massachusetts is the place where the Plaintiff is located, the place where the contract was created and the place of injury, I find that the interests of Massachusetts in this contract-centered dispute outweigh those of Rhode Island.

Further, considering the justified expectations factor, I find that there is reason to presume in this case that when Defendants allegedly committed the allegedly tortious actions directed at a Massachusetts contract, they could reasonably expect that Massachusetts law, rather than Rhode Island law, would apply. In fact, both Defendants were aware of the existence of the Contingency Agreement, its choice of law provision, and the fact that Plaintiff was located in Massachusetts.

Accordingly, I conclude that tort-based claims in this case are governed by Massachusetts law.

### 3. Chapter 93A Claims

Finally, in Counts VI and XIII, Plaintiff alleges that Defendants Palmisciano and Lafazia engaged in unfair and deceptive acts in violation of Chapter 93A. Specifically, Plaintiff alleges Defendant Lafazia violated Chapter 93A by intentionally interfering with Plaintiff's contractual relations and that both Defendants violated this statute by knowingly and willfully implementing a fraudulent scheme.

This cause of action is viable only if I find that Massachusetts law applies to the issues underlying these allegations. *See Trent*, 120 F.Supp.2d at 97. The First Circuit has provided significant guidance on the issue of how to characterize a Chapter 93A claim for choice of law purposes.

9. Nonetheless, I find that Rhode and Island and Massachusetts do not necessarily provide the same cause of action for such claims. The Defendant contends that a conflict potentially exists when the interference with contractual relations is alleged against an attorney representing a client. *Compare Toste Farm Corp. v. Hadbury*, 798 A.2d 901, 907 (R.I.2002) ("an attorney has no general duty to the opposing party, and therefore, a third party does not ordinarily have standing to pursue a claim for tortious interference against his adversary's attorney") *with Cavic-*

chi v. Koski, 67 Mass.App.Ct. 654, 855 N.E.2d 1137, 1144 (2006) (plaintiff could "endeavor to prove that [his successor attorney], with improper motive or means, induced [his former client] to refuse to pay [Plaintiff's fee"). Whether Glassman LLC is properly considered in an "opposing" or "adversary" position under *Toste* regarding its relation with Palmisciano which is at the core of this dispute is open to question. But because I find that Massachusetts substantive law governs, I need not analyze the implications of *Toste* more deeply.

*See, e.g., Crellin Technologies, Inc. v. Equipmentlease Corp.,* 18 F.3d 1, 11–13 (1st Cir.1994) ("[W]hen a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes."); *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.,* 986 F.2d 607, 609 (1st Cir.1993) (when the chapter "93A claims amount to embroidered 'breach of contract' claims," such claims may trigger a contractual conflicts analysis).

Because I find that Massachusetts law applies to both the tort-based and the contract-based claims asserted in this case, I need not, in any event, determine whether Plaintiff's Chapter 93A claims sound primarily more like a tort or a contract claim. In either circumstance, such claims are governed by Massachusetts law.

## B. Substantive Analysis

### 1. Contract-based Claims (Counts I and II)

#### a. Breach of Contract [10]

Plaintiff argues that Palmisciano breached the Contingency Agreement by refusing to pay the full amount due. Palmisciano responds, however, that Plaintiff is not entitled to receive the full amount due under the Contingency Agreement because he has already been compensated effectively on the basis of quantum meruit.

 The basic principles governing contracts between attorney and client are well settled. "There is no question that a client must have absolute trust in the integrity, the judgment, and the ability of his or her attorney." *Malonis v. Harrington,* 442 Mass. 692, 816 N.E.2d 115, 122 (2004).

"When a client, for whatever reason, loses faith in his or her attorney, the client has the unqualified right to change lawyers." *Id.* (citing *Duggan v. Taunton,* 360 Mass. 644, 277 N.E.2d 268, 272 (1971)). The general rule in Massachusetts is that the "client's discharge of an attorney ends the attorney's right to recover on the contract of employment and, thereafter, an attorney can recover *only* for the reasonable value of his services on the basis of quantum meruit." *Craft v. Kane,* 65 Mass.App.Ct. 322, 839 N.E.2d 854, 857 (2005) (quoting *Opert v. Mellios,* 415 Mass. 634, 614 N.E.2d 996, 997 (1993)) (emphasis added).

Plaintiff argues, however, that he is entitled to recover under the terms of the Contingency Agreement rather than under a quantum meruit theory because Defendant Palmisciano acted in bad faith when he discharged him. In doing so, Plaintiff mainly relies on *In re Discipline of an Attorney,* 451 Mass. 131, 884 N.E.2d 450 (2008) in which the Supreme Judicial Court of Massachusetts held that "[i]f the Client were to discharge the attorney in bad faith, [the Court has] recognized that recovery fees under the contingency agreement *might* be in order." *Id.* at 461 n. 16 (citing *Opert,* 614 N.E.2d at 997) (emphasis added). In *Opert,* the SJC suggested that factors, in addition to the bad faith of the client, may be taken into consideration in determining whether to permit recovery on the contract or solely on the basis of quantum meruit. *Opert,* 614 N.E.2d at 998 (discussing *Salem Realty Co. v. Matera,* 384 Mass. 803, 426 N.E.2d 1160, 1160–61 (1981)). These factors were said to include whether (1) the plaintiff had rendered substantial performance on the contract, (2) the defendant incurred costs

---

10. Because Count VII, which was principally a quantum meruit count, has been dropped by Plaintiff, *see* Note 4 *supra,* I do not separately address the claim for declaratory judgment of entitlement to the contract amounts also embedded in that Count. The question of entitlement to contract amounts is fully comprehended by Count I.

for legal services to complete the agreement, (3) the plaintiff's conduct in handling the claim was proper, and (4) the agreement reached by both parties was fair. *Id. In Opert,* the Court ultimately concluded that "on the record before us, we are unable to decide whether we should adopt the rule we speculated on in *Salem Realty Co. v. Matera, supra,* granting recovery on the contingent fee contract in some circumstances." *Id.*

■ As in *Opert,* the record before me is insufficient to support summary judgment with respect to Plaintiff's claim for breach of contract because genuine issues of material fact exist as to Plaintiff's entitlement to recover the full amount due pursuant to the Contingency Agreement. Issues remain as to whether Defendant Palmisciano acted in bad faith when discharging Plaintiff and whether Plaintiff handled the claim in a proper manner. On the one hand, a jury may rely on Defendant Palmisciano's statement to McLaughlin in which he admitted that his intention was to avoid paying Plaintiff's fee and ultimately find that Defendant Palmisciano acted in bad faith when he terminated Plaintiff.[11] On the other hand, the issue of bad faith must be considered in light of Plaintiff's conduct in handling the case.

Moreover, it appears that the *Opert* factors while frequently invoked as theory in the past have failed in practice to support enforcement of a contingency agreement by terms. Plaintiff was unable to cite and my research has not identified any cases in which, while contemplating the application of the *Opert* factors, a Massachusetts court has applied these factors to enforce a contingency fee agreement. Rather, the trend appears to be not to enforce this type of agreement by its terms. *See, e.g.,*

*Provanzano v. Nat'l Auto Credit, Inc.,* 10 F.Supp.2d 44, 52 (D.Mass.1998) (denying the enforcement of the contingency fee agreement based on the *Opert* factors); *Bartermax, Inc. v. Discover Boston Multi–Lingual Trolley Tours, Inc.,* No. 06–P–1827, 71 Mass.App.Ct. 1107, 2008 WL 314150, at *2 n. 4 (Mass.App.Ct. Feb. 5, 2008) (same); *Malonis,* 816 N.E.2d at 120 n. 6 (same); *Townsend v. Tyng Textiles, LLC,* No. 01–P–1357, 57 Mass.App.Ct. 1107, 2003 WL 253083, at *1 (Mass.App.Ct. Feb. 5, 2003) (same).

Further it appears that invocation of the *Opert* factors will not need to be considered in cases involving contingency contracts executed after April 11, 2008 when *In the Matter of the Discipline of An Attorney* was decided. There the SJC announced:

> looking to the future, we doubt whether it is appropriate for a contingent fee agreement to contain a provision—as the attorney's agreement did in this case—giving a lawyer, on discharge by the client before termination of the matter for which representation was sought, a right to recover an amount greater than the fair value of the lawyer's services and expenses up to the date of discharge.

323 Ill.Dec. 685, 894 N.E.2d at 453.

The Contingency Agreement was, however, executed before April 11, 2008 and I must consequently consider the *Opert* factors and the question of bad faith. Accordingly, because, considering *Opert,* I find that genuine issues of material fact exist as to whether Plaintiff should recover under the Contingency Agreement or solely under the quantum meruit principles, I conclude that Plaintiff's motion for sum-

---

**11.** I note that the summary judgment record before me contains a dispute with respect to Palmisciano's use of an ethnic slur when questioning why he should pay Plaintiff, but no dispute that he questioned why he should pay the fee.

mary judgment on his breach of contract claim should be denied.[12]

### b. Breach of Implied Covenant

Plaintiff argues that Palmisciano breached the implied covenant of good faith and fair dealing by refusing to pay the full amount due pursuant to the Contingency Agreement. Again, Defendant Palmisciano responds that Plaintiff has already received the fair value of his services through the release of funds as part of the settlement and Palmisciano therefore cannot be found to have breached the covenant.

■ It is a cardinal rule of Massachusetts contract law that "[e]very contract is subject to an implied covenant of good faith and fair dealing." *Liss v. Studeny*, 450 Mass. 473, 879 N.E.2d 676, 680 (2008) (citing *Kerrigan v. Boston*, 361 Mass. 24, 278 N.E.2d 387, 393 (1972)). The purpose of the covenant is to ensure that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 820 (1991)) (internal citations omitted).

■ For reasons similar to those discussed in Section III.B.1.a. *supra*, regarding breach of contract, I find that genuine issues of material fact exist as to whether Plaintiff did in fact breach the implied covenant of good faith and fair dealing. Accordingly, I will deny Plaintiff's motion for summary judgment with respect to such claim.

### 2. Tort-based Claims (Counts v. and IX)

#### a. Tortious Interference

Plaintiff alleges that Defendant Lafazia tortiously interfered with Plaintiff's contractual relationship when he allegedly aided Defendant Palmisciano in seeking to nullify the Contingency Agreement in order to avoid paying the attorney's fees.

■ "The elements of intentional interference with contractual relations under Massachusetts law are as follows: (1) [plaintiff] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive and means; and (4) the plaintiff was harmed by the defendant's actions." *MHA Fin. Corp. v. Varenko Invs. Ltd.*, 583 F.Supp.2d 173, 181–82 (D.Mass.2008) (citing *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 410 Mass. 262, 571 N.E.2d 1363, 1369 (1991)). This cause of action can apply to successor attorneys representing their client. *See Cavicchi v. Koski*, 67 Mass. App.Ct. 654, 855 N.E.2d 1137, 1144 (2006) (plaintiff could "endeavor to prove that [his successor attorney], with improper motive or means, induced [his former client] to refuse to pay [Plaintiff]'s fee.").

■ Here, the record demonstrates that the first two elements of a claim for intentional interference with contractual relations are plainly satisfied: (1) an agreement existed between Plaintiff and Defendant Palmisciano and (2) Defendant Lafazia clearly knew of the existence of the Contingency Agreement. The third is arguably made out; there is a genuine

---

12. I find, however, that the overarching issue governing the breach of contract claim is whether the attorney's fees claimed by the Plaintiff are excessive, an issue for which the court has considerable gatekeeper responsi- bilities before permitting it to be presented to a jury. Accordingly, I have directed Plaintiff to file a motion for summary judgment on this issue.

issue of fact whether Defendant Lafazia's interference—in his words "screw[ing]" Glassman, albeit out of what is characterized as "an unreasonable fee"—was improper in motive and means. In this connection, I note that the prodigiously litigious Defendant Palmisciano himself asserts that "[t]he advice given by Attorney Lafazia to [him] with respect to fees that may be due or not due to Attorney Glassman was clearly erroneous, unethical and contrary to the applicable rules of professional conduct." It remains, however, unclear whether Plaintiff actually suffered any increment of harm from the Defendant Lafazia's conduct. As discussed above, whether Plaintiff is entitled to recovery under the breach of contract theory or whether he has already received the fair value of his services is an issue for the jury to decide. If he did suffer harm and the element of improper motive and means is proven, Lafazia may be jointly and severally liable for the additional unpaid attorney's fees.

In any event, I will deny Plaintiff's and Defendant Lafazia's motions for summary judgment with respect to the claim for intentional interference with contractual relations.

### b. Civil Conspiracy

Plaintiff alleges that the joint conduct of both Defendants is sufficient to establish a claim for civil conspiracy. Specifically, Plaintiff contends that Defendants engaged in a common plan fraudulently to contrive a claim of abandonment of representation in an effort to deprive him of his fee.

■ Applying Massachusetts law, federal courts have recognized two types of civil conspiracy under which a plaintiff may state a cause of action. *See Metro. Prop. and Cas. Ins. Co. v. Boston Regional Physical Therapy, Inc.*, 550 F.Supp.2d 199,

202 (D.Mass.2008). "The first, commonly referred to as 'true conspiracy', 'occurs when the conspirators, acting in unison, exercise a peculiar power of coercion over the plaintiff that they would not have had if they acted alone.'" *Id.* (quoting *Wajda v. R.J. Reynolds Tobacco Co.*, 103 F.Supp.2d 29, 37 (D.Mass.2000)). "The second form of conspiracy recognized in Massachusetts is the tort-based civil conspiracy 'more akin to a theory of common law joint liability in tort.'" *Id.* (quoting *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir.1994)). "For liability to attach with respect to the second form of conspiracy there must be an agreement between two or more people to do a wrongful act and proof of some tortious act in furtherance of the agreement." *Id.* This second type of civil conspiracy derives from "'concerted action,' whereby liability is imposed on one individual for the tort of another." *Kurker v. Hill*, 44 Mass.App.Ct. 184, 689 N.E.2d 833, 836 (1998) (citing *Aetna*, 43 F.3d at 1564).

■ Here, Plaintiff alleges the second form of conspiracy. I find that genuine issues of material fact exist as to whether Defendants engaged in a plan fraudulently to contrive a claim of abandonment of representation by Plaintiff. There is evidence that Plaintiff failed to inform Defendant Palmisciano of Cohen's departure which may justify the conclusion that Plaintiff had in fact abandoned the representation for which Palmisciano contracted. Whether Defendants did in fact engage in a conduct sufficient to establish civil conspiracy is therefore an issue for the jury to decide.

Consequently, I will deny Plaintiff's and Defendant Lafazia's motions for summary judgment with respect to the civil conspiracy claim against both Defendants.

### 3. Chapter 93A Claims (Count VI and VIII)

Plaintiff alleges that Defendant Lafazia's intentional interference with the Contingency Agreement and Defendants' civil conspiracy constitute unfair trade practices in violation of Chapter 93A § 11. I find Plaintiff failed to show that Defendants engaged in a business transaction with him as contemplated by the statute.

■ In order for Defendants to be liable under Chapter 93A, the transaction at issue must have occurred in the conduct of "any trade or commerce." MASS. GEN. LAWS ch. 93A §§ 9, 11. Section 11's reference to persons engaged in trade or commerce specifically refers "to individuals acting in a business context." *Lantner v. Carson,* 374 Mass. 606, 373 N.E.2d 973, 976 (1978); *accord Linkage Corp. v. Trustees of Boston Univ.,* 425 Mass. 1, 679 N.E.2d 191, 206–07 (1997). The "business context test" for section 11 involves assessing various relevant factors such as "the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties [as well as] whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons ... and whether the participant played an active part in the transaction." *Milliken & Co. v. Duro Textiles, LLC,* 451 Mass. 547, 887 N.E.2d 244, 260 (2008) (quoting *Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167, 176 (1980)).

■ There is no actionable allegation in this case of a commercial relationship between the Plaintiff and the Defendant Lafazia; their sole contact appears to have been in connection with litigation on behalf of Palmisciano. I find that such an interaction alone is insufficient to warrant a finding of a commercial relationship. *See, e.g., First Enters., Ltd. v. Cooper,* 425 Mass. 344, 680 N.E.2d 1163, 1165 (1997)

(attorney did not inject himself in a commercial transaction because his statements were not made to influence an external marketplace); *Cavicchi,* 855 N.E.2d at 1144–45 (discharged attorney and retained attorney with respect to common clients engaged in intra-enterprise dispute); *Wozniak & Padula, P.C. v. Gilmore, Rees, Carlson & Cataldo, P.C,* No. 1594, 2005 WL 851085, at *2 (Mass.App. Div. Apr. 8, 2005) (commercial relationship did not exist between discharged law firm and second law firm, consequently claim for violation of statute prohibiting unfair and deceptive practices precluded); *cf. St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis,* 262 F.3d 53, 67 (1st Cir.2001) (attorney's fraudulent scheme to dupe workman's compensation insurer into paying benefits to which attorney's client was not entitled found to have an effect on trade or commerce under Chapter 93A).

Similarly, I find that Plaintiff did not engage in trade or commerce with Defendant Palmisciano for purposes of Chapter 93A. *Provanzano,* 10 F.Supp.2d at 52 ("Rendering legal advice and representation is not engaging in trade or commerce with a client within the meaning of Chapter 93A.") (citing *Tetrault v. Mahoney, Hawkes & Goldings,* 425 Mass. 456, 681 N.E.2d 1189, 1195 (1997)).

To support his claim that the unfair or deceptive acts occurred in the conduct of "trade or commerce," Plaintiff contends that section 11 does not require privity of contract. *See Nei v. Boston Survey Consultants, Inc.,* 388 Mass. 320, 446 N.E.2d 681, 684 (Mass.1983). While I agree with Plaintiff as to this proposition, I find that it does not eliminate the requirement that the wrongful conduct must arise in a business context. *See Swenson v. Yellow Transp., Inc.,* 317 F.Supp.2d 51, 57 (D.Mass.2004) (citing *Maillet v. ATF–*

*Davidson Co., Inc.*, 407 Mass. 185, 552 N.E.2d 95, 99 (1990)).

Having concluded that Plaintiff's Chapter 93A claims fail with respect to both Defendants, I will deny Plaintiff's motion for summary judgment with respect to such claims and direct judgment for both Defendants as to these claims.

## IV. CONCLUSION

For the reasons discussed more fully above, I DENY Plaintiff's motion for summary judgment (Dkt. No. 70.) in its entirety and GRANT Defendant Lafazia's motion for summary judgment (Dkt. No. 75.) as to Plaintiff's Counts VI and VIII, but DENY this motion as to Plaintiff's Counts V and IX. In addition, I will GRANT summary judgment to Defendant Palmisciano as to Count VIII for the same reasons summary judgment has been granted to Defendant Lafazia on the Chapter 93A claims.[13] I note further that Counts III and IV and Count VII are dismissed for the reasons found in Notes 1, 4 and 10 of this Memorandum and Order.

13. The Plaintiff in opposing Defendant Lafazia's motion for summary judgment has had notice and a fair opportunity to present its arguments regarding the "trade or commerce" element of a Chapter 93A. Consequently, it is appropriate to enter summary judgment *sua sponte* for Palmisciano as well. *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 431 (1st Cir.1998).